NOT FOR PUBLICATION [12]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BIENVENIDO CASILLA, : | |
| : | |
| Plaintiff, : | Civil Action No. 05-4590 (FLW) |
| : | |
| v. : | |
| : | OPINION |
| NEW JERSEY STATE PRISON, et al., : | |
| : | |
| Defendants. : | |

**WOLFSON, UNITED STATES DISTRICT JUDGE**

Before the Court is the motion filed by Defendant Devon Brown, the former Commissioner of the New Jersey Department of Corrections ("Defendant"), to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), the Complaint of Plaintiff Bienvenido Casilla, pro se ("Plaintiff").[1] Alternatively, Defendant seeks summary judgment, pursuant to Fed. R. Civ. P. 56(c), on Plaintiff's claims against him. Plaintiff, who is currently incarcerated at New Jersey State Prison ("NJSP") in Trenton, New Jersey, alleges, pursuant to 42 U.S.C. § 1983, that Defendant violated his Eight Amendment right to be free from cruel and unusual punishment by demonstrating deliberate indifference to Plaintiff's medical needs. Specifically, Plaintiff argues that Defendant failed to provide him with medical care, failed to properly supervise the medical care provided by CMS, and failed to personally respond to Plaintiff's complaints about the medical treatment

---

[1] Plaintiff's Complaint also names: George E. Acheve, M.D., Raymund T. Tagle, M.D., Rizwana Naveed Hamid, M.D., Laurence Donkor, M.D., and Arlene Tinker, M.D., all of whom Plaintiff alleges are physicians employed by Correctional Medical Services ("CMS") and against whom he asserts § 1983 and medical negligence claims. I note that none of those additional defendants has yet moved against Plaintiff's Complaint. Accordingly, this Opinion relates only to the motion filed by Defendant Brown.

provided to him by CMS.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. For the reasons that follow, I find that Plaintiff's claim against Defendant, in his official capacity, is barred by the Eleventh Amendment. Therefore Defendant's motion to dismiss that claim is granted. Furthermore, to the extent Plaintiff asserts his claim against Defendant in his individual capacity, I find there is insufficient evidence to create a material dispute of fact over Defendant's lack of direct or indirect participation in the circumstances giving rise to Plaintiff's claim. Similarly, I find insufficient evidence to create a material factual dispute over Defendant's assertion that no policy, practice, or custom, about which Defendant was aware, existed at NJSP which created an unreasonable risk of injury to Plaintiff. Consequently, Defendant's motion for summary judgement on Plaintiff's claim against him in his individual capacity is granted.

## I.     BACKGROUND

Plaintiff's claim arises primarily out of Defendant's alleged deliberate indifference to Plaintiff's medical needs associated with his knee injuries, abdominal hernia, and digestive disorder. See Plaintiff's Complaint ("Compl.") pg. 4. Plaintiff alleges that in January 2001, he slipped and fell at NJSP, resulting in knee injuries for which he sought immediate treatment.[2] Plaintiff's Brief in Opposition to Defendant's Motion ("Pf. Opp. Br.") at 2. Plaintiff alleges that despite his numerous complaints of pain and requests for medical care, he was not provided with significant treatment until sometime in 2003, when he underwent a Magnetic Resonance Imaging

---

[2] Defendant does not allege the basis of his knee injuries in his pro se Complaint. However, he provides such background in his brief in opposition to Defendant's motion. In light of Plaintiff's pro se status, and for purposes of thoroughness, I consider the facts alleged in his brief notwithstanding their omission from his Complaint.

2

("MRI") procedure. Id.  At that time, Plaintiff alleges a CMS doctor recommended that he undergo surgery on his knee, however, he alleges that such surgery did not occur until approximately six months later, in February 2004. Id.  Plaintiff further alleges that once he finally underwent surgery, he was not provided with appropriate medication afterward to prevent infection.  As a result, Plaintiff alleges he remained in constant pain and eventually required a second knee surgery, which he underwent in December 2005. Id. at 2-3.  Finally, Plaintiff also alleges that he was not provided with treatment for abdominal pain he describes as severe, and which he claims has persisted for more than two years.  A brief survey of the voluminous record of Plaintiff's medical treatment at NJSP follows.

On September 28, 2000, Plaintiff participated in an intake evaluation at NJSP, conducted by CMS, during which he reported no immediate complaints. See Affidavit of George Riehm ("Riehm Aff."), Ex. A at 001.  On May 15, 2002, CMS Dr. Rizwana Naveed Hamid, M.D. ("Dr. Hamid"), treated Plaintiff for pain in his left knee. Id. at 103-04.  Dr. Hamid diagnosed Plaintiff with arthritis and gave him Tylenol and a knee brace. Id. at 104.  On July 15, 2002, CMS Dr. Raymund T. Tagle, M.D. ("Dr. Tagle"), treated Plaintiff for pain in his right knee. Id. at 113.  An x-ray produced normal results and Dr. Tagle gave Plaintiff Motrin for his pain. Id. at 114, 116.  On August 13, 2002, Plaintiff was admitted to the infirmary for pain in his lower abdomen and was prescribed Bentyl, a medication used to treat irritable bowel syndrome. Id. at 117-26.  On August 14, 2002, Plaintiff was discharged from the infirmary. Id. at 27.

On January 7, 2003, CMS nurse Thomas treated Plaintiff for pain in his lower back and abdomen. Id. at150.  The results of the various tests administered to Plaintiff produced normal results. Id. at 157-61.  On March 13, 2003, Dr. Tagle treated Plaintiff for abdominal pain. Id. at

3

165-67.  All laboratory tests produced normal results. Id. at 162-64.  On April 1, 2003, Nurse Thomas treated Plaintiff for abdominal pain, nausea and a sensitivity to milk. Id. at 176-77.  In accord with direction from a CMS physician, Nurse Thomas placed restrictions on Plaintiff's diet. Id. at 176.  On April 21, 2003, CMS nurse Green treated Plaintiff for abdominal pain. Id. at 181-82.  On April 28, 2003, Dr. Hamid diagnosed Plaintiff with gastritis and gave him Tagamet. Id. at 183-84.

On May 17, 2003, CMS nurse Alphin treated Plaintiff for abdominal discomfort. Id. at 188-89.  On June 2, 2003, CMS Dr. Mechor Ong, M.D. ("Dr. Ong"), treated Plaintiff for abdominal pain and knee pain, and prescribed Plaintiff Darvocet and Prilosec. Id. at 190-93.  The Prilosec was not immediately available, so on June 6, 2003, Plaintiff was given Zantac until his prescription could be filled. Id. at 201.  On June 18, 2003, Dr. Ong treated Plaintiff again and referred him to a gastroenterologist. Id. at 205.  During a follow-up visit with Plaintiff on June 27, 2003, Dr. Ong noted that Plaintiff had been scheduled to see an orthopedic specialist and gastroenterologist. Id. at 206-08.  On July 24, 2003, Nurse Thomas examined Plaintiff while he awaited treatment from a specialist. Id. at 209-210.  On July 31, 2003, an orthopedist treated Plaintiff's knees and his right index finger. Id. at 212-13.  The same day, Plaintiff was also examined by a gastroenterologist, who ordered him to undergo an upper endoscopy. Id. at 211.

On August 12, 2003, Dr. Talbot treated Plaintiff for stomach pain and food intolerance. Id. at 215-17.  On August 18, 2003, Plaintiff underwent an MRI procedure on both knees. Id. at 229.  On August 22, 2003, Dr. Talbot referred Plaintiff for an abdominal computed tomography ("CT") scan. Id. at 224-25.  On August 27, 2003, Dr. Talbot concluded that the results of Plaintiff's upper gastrointestinal ("GI") x-ray were normal, and referred plaintiff for a kidneys,

ureters, and bladder ("KUB") x-ray. Id. at 230.  On August 29, 2003, CMS orthopedist Dr. Mark J. Pressman, M.D. ("Dr. Pressman"), evaluated Plaintiff. Id. at 227-28.  On September 4, 2003, Dr. Pressman diagnosed Plaintiff with chronic Gastroesphegeal Reflux Disease ("GERD") and provided Plaintiff with some initial treatment. Id. at 233.

On September 22, 2003, Dr. Talbot treated Plaintiff for both stomach and knee pain. Id. at 236-37.  On October 4, 2003, Nurse Alphin treated Plaintiff for abdominal pain. Id. at 238-39.  On November 23, 2003, plaintiff was admitted to the NJSP infirmary and prepared for a colonoscopy, which he underwent the following day at a nearby hospital. Id. at 245-47, 250.  The results of Plaintiff's colonoscopy led doctors to diagnose Plaintiff with a sliding hiatus hernia, gastritis, gastric antrum nodule and functional bowel disorder. Id. at 255.  Plaintiff was treated and discharged from the infirmary on November 28, 2003. Id. at 254. On December 29, 2003, Dr. Talbot provided Plaintiff with follow-up treatment for his knees and stomach pain. Id. at 259- 61.

On February 11, 2004, Plaintiff underwent arthroscopic surgery on both of his knees. Id. at 269-70.  On March 4, 2004, CMS nurse Kathleen Skinner treated Plaintiff for abdominal pain. Id. at 271-72.  Thereafter, Dr. Talbot treated Plaintiff on March 8, 2004, and March 10, 2004, for abdominal pain. Id. at 273-75, 279-80.  The results of the various tests Plaintiff underwent on those occasions produced normal results. Id. at 279.  On April 5, 2004, Dr. Talbot treated Plaintiff for continuing abdominal pain. Id. at 285-87.  On April 20, 2004, CMS nurse Barbara Morris treated Plaintiff for stomach pain and discussed with Plaintiff his dissatisfaction with the medication he had been prescribed. Id. at 290-91.  On April 21, 2004, CMS Dr. Tinker treated Plaintiff for abdominal pain. Id. at 292-93.  On May 21, 2004, a CMS orthopedist saw Plaintiff for follow-up treatment after his knee surgery and ordered Plaintiff to begin physical therapy. Id.

at 294-95.

On May 24, 2004, Plaintiff complained of abdominal pain and was referred to see a specialist by CMS nurse Morris. Id. at 297-98.  On May 27, 2004, Dr. Tinker treated Plaintiff for chronic GERD and referred him for evaluation of potential surgical options. Id. at 299-301.  On June 10, 2004, Nurse Skinner again treated Plaintiff for abdominal pain. Id. at 304-05.  On June 23, 2004, a gastroenterologist evaluated Plaintiff and discussed with him surgical options to relieve his GERD. Id. at 308.  On July 19, 2004, Nurse Morris conducted a follow-up gastroenterology consultation with Plaintiff. Id. at 310-11.  On July 23, 2004, Plaintiff was diagnosed with diverticulosis. Id. at 312.

On August 3, 2004, Dr. Tinker provided Plaintiff with follow-up care for knee pain and GERD. Id. at 313-15.  An August 12, 2004 x-ray of Plaintiff's right knee produced normal results. Id. at 318.  On September 13, 2004, Nurse Morris treated Plaintiff for knee pain. Id. at 319-20.  On September 21, 2004, CMS Dr. Lawrence Donkor, M.D. ("Dr. Donkor"), treated Plaintiff for epigastric pain and left knee pain. Id. at 321-323.  On November 10, 2004, and November 16, 2004, Nurse Morris treated Plaintiff for stomach pain. Id. at 339-40, 342-43.  On November 18, 2004, Dr. Tinker replaced the Plaintiff's Tagamet prescription with a prescription for Prevacid. Id. at 351-52.  On December 2, 2004, a CMS orthopedist treated Plaintiff and recommended that he receive a second knee surgery. Id. at 362.  On February 15, 2005, Dr. Donkor treated Plaintiff for abdominal pain. Id. at 371-73.  On February 20, 2005, CMS nurse Chelene Kuchefski treated Plaintiff for abdominal pain. Id. at 376-77.  On February 28, 2005, Dr. Donkor treated Plaintiff for chronic GERD, and prescribed Prilosec. Id. at 381-383.  On March 11, 2005, CMS nurse Vinch treated Plaintiff for knee pain, and informed Plaintiff that his second

6

knee surgery had been approved and scheduled. Id. at 388-91.

On May 6, 2005, CMS Dr. Jeffrey Pomerantz, M.D. ("Dr. Pomerantz"), treated Plaintiff for right knee and abdominal pain. Id. at 408-10. On June 10, 2005, Nurse Skinner treated Plaintiff for abdominal pain. Id. at 418-19. On June 13, 2005, CMS Dr. Manar Hanna, M.D. ("Dr. Hanna"), treated Plaintiff for abdominal and knee pain. Id. at 420-22. Dr. Hanna referred Plaintiff for orthopedic and GI consults, and instructed him to avoid lying down for one hour after eating a meal. Id. at 421. During a July 13, 2005 evaluation by a CMS gastroenterologist, Plaintiff requested surgery to ease his persistent abdominal pain. Id. at 429, 432. The gastroenterologist concluded that more laboratory tests were required to determine the cause of Plaintiff's pain before surgery could be considered an option for relief. Id. at 437. On August 31, 2005, Plaintiff's upper GI series produced normal results. Id. at 455. On September 10, 2005, Nurse Morris informed Plaintiff of his test results and referred him to a doctor. Id. at 448-49. On September 14, 2005, a CMS gastroenterologist treated Plaintiff and referred him for additional testing. Id. at 451. According to Plaintiff, on December 2005, he underwent a second knee surgery. Pf. Opp. Br. at 2.

In addition to medical treatment for knee pain and abdominal pain as outlined above, the record reflects that, since October 2000, Plaintiff sought treatment from CMS staff at NJSP approximately thirty seven times for problems including difficult urination, right index finger pain, foot pain, sprained ankle, lower back pain, cough, cold symptoms, sore throat, chest pain, cardiac care, upper respiratory infection, a sinus infection, allergies, high cholesterol, constipation, diarrhea, and to renew his various prescriptions. See generally Riehm Aff. Ex. A. Plaintiff was also added to the Chronic Care Clinic roster for cardiac monitoring, provided at

least six urinalysis examinations, two cholesterol tests, various blood tests, an EKG test, and a hand x-ray. Id.

The record also demonstrates that Plaintiff, and others on his behalf, attempted to contact the appropriate authorities to investigate Plaintiff's medical condition and help direct further action. Attached to Plaintiff's Complaint are copies of several letters from various individuals advocating for investigation into Plaintiff's medical care at NJSP. Among them are: letters of March 27, 2003, and August 6, 2003, from James K. Smith ("Smith"), an attorney at the Office of the New Jersey State Public Defender who represented Plaintiff in the past, addressed to both Roy L. Hendricks, the Superintendent of NJSP, and David Clark, the Interim Medical Director at NJSP; a July 7, 2004 letter from Smith to Sheila Lee, in employee in Health Services at NJSP; letters of May 19, 2003, and November 4, 2004 from Ana Pagan ("Pagan"), Plaintiff's mother, to Defendant; an April 8, 2003 reply to Smith from Donald Mee, Jr. , the Assistant Superintendent of NJSP; as well as a May 19, 2003 reply to Pagan from James Barbaro, the Director of Operations at NJSP, which was sent to Plaintiff because Pagan did not include a return address in her letter. See Compl. In addition, Plaintiff also attached to his Complaint copies of seven Administrative Remedy request forms he filed between September 2003, and November 2004, in which he sought medical treatment for his various ailments. Id.

On September 20, 2005, Plaintiff submitted a Complaint together with an application to proceed in forma pauperis to this Court. The Complaint was marked filed on October 5, 2005. On November 22, 2005, the Clerk of the Court granted Defendant an extension until December 6, 2005, to answer Plaintiff's Complaint. On January 9, 2005, the Honorable John J. Hughes, U.S.M.J., granted Defendant's motion for a second extension, and ordered Defendant to file an

Answer, or motion in lieu thereof, by February 6, 2006. Defendant timely filed this motion, to which Plaintiff submitted written opposition on June 1, 2006.

**II.    DISCUSSION**

**A.    Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

In considering a motion to dismiss a plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom. In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002). However, legal conclusions offered in the guise of factual allegations are not afforded a similar presumption of truthfulness. Chugh v. Western Inventory Services, Inc., 333 F. Supp. 2d 285, 289 (D.N.J. 2004) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). A complaint may be dismissed for failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. Hishon, 467 U.S. at 73. Also, on a motion to dismiss, a court generally does not consider documents extraneous to the pleadings, but may consider a "document integral to or explicitly relied upon in the complaint ... without converting the motion to dismiss into one for summary judgment." In re Burlington Coat Factory Secs. Litig., 114 F.3d at 1426 (citation omitted).

**B.    Summary Judgement Standard**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-

9

moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id. The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. Celotex, 477 U.S. at 330. Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**C.      Plaintiff's 42 U.S.C. § 1983 Claim**

Plaintiff alleges, pursuant to 42 U.S.C. § 1983, that Defendant violated his Eighth Amendment guarantee of freedom from cruel and unusual punishment. Specifically, Plaintiff claims that in his official capacity as Commissioner of the New Jersey Department of Corrections, Defendant was deliberately indifferent to Plaintiff's medical needs. In response, Defendant asserts the Eleventh Amendment bars civil suits against persons in their official capacities. Consequently, Defendant argues that Plaintiff's § 1983 claim should be dismissed.

The Eleventh Amendment establishes that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by citizens or subjects of any foreign state." U.S. Const. Amend. XI. Thus, without consent or a waiver of immunity, a federal court cannot exercise jurisdiction over claims brought by an individual against a state or a state agency. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99 (1984). Moreover, the Eleventh

Amendment bars suit even when the state is not named a party to the action as long as "the state is the real, substantial party in interest." Bennett v. City of Atlantic City, 288 F. Supp. 2d 675, 679 (D.N.J. 2003). The Supreme Court has held that a § 1983 claim seeking damages against a state official in his official capacity must be dismissed because the real party at interest is the state and the state is not a "person" within the meaning of 42 U.S.C. § 1983. Will v. Michigan Department of State Police, 491 U.S. 58, 70-71 (1989). Accordingly, state agencies and officials acting in their official capacities are routinely afforded Eleventh Amendment immunity. Buckhannon Bd. & Care Home, Inc., v. W. Va. Dept. of Health and Human Res., 532 U.S. 598, 609 n.10 ("States and state officers acting in their official capacity are immune from suits for damages in federal court."); Will v. Mich. Dept. of State Police, 491 U.S. 58, 70-71 (1989); Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 658 (3d Cir. 1989).

  To determine if a claim is barred by sovereign immunity, a court must initially determine if the state is the real party in interest. Under Fitchik, a court must consider: (1) whether payment of a judgment resulting from the suit would come from the state treasury; (2) the status of the entity under state law; and (3) the entity's degree of autonomy. See 873 F.2d at 659. However, the Third Circuit has expressly held that the dispositive question in determining Eleventh Amendment immunity is "whether any judgment would be paid from the state treasury." Carter v. City of Philadelphia, 181 F.3d 339, 348 (3d Cir. 1999) (citing Bolden v. Southeastern Pennsylvania Transportation Authority, 953 F.2d 807, 816 (3d Cir. 1991)). A defendant bears the burden of proving that he is entitled to sovereign immunity. See Chisolm v. McManimon, 275 F. 3d 315, 323 (3d Cir. 2001).

According to N.J. Stat. Ann. § 30:1 B-2, the New Jersey Department of Corrections ("NJDOC"), is a principal department of the state's executive branch. The Commissioner of the NJDOC is "appointed by the Governor, with the advice and consent of the Senate, and shall serve at the pleasure of the Governor. . ." N.J. Stat. Ann. § 30:1 B-4. Thus, courts have consistently extended sovereign immunity to NJDOC officials in § 1983 actions. See, e.g., Snyder v. Baumecker, 708 F. Supp. 1451, 1455-56 (D.N.J. 1989) (finding NJDOC is "the alter ego of the State of New Jersey, and as such, is immune from suit under the [E]leventh [A]mendment"); Jordan v. NJDOC, 881 F. Supp. 947, 952 (D.N.J. 1995) (finding Eleventh Amendment sovereign immunity extends to NJDOC).

In this case, Plaintiff's Complaint names the Commissioner of the NJDOC, rather than a specific person. Thus, Plaintiff's § 1983 claim against Defendant, on its face, alleges liability in his official capacity only. As noted above, this Court has consistently extended sovereign immunity to NJDOC officials. Thus, to the extent that Plaintiff seeks damages against Defendant in his official capacity, such a claim is barred by the Eleventh Amendment, and Plaintiff's claim is dismissed on that basis.

However, although Plaintiff cannot sustain a § 1983 claim against Defendant in his official capacity, he may be able to recover from Defendant for actions taken in his individual capacity.[3] A plaintiff can seek "to impose personal liability upon a government official for action

---

[3] The Third Circuit is among a majority of federal circuit courts which employ a "course of proceedings" test to determine whether a plaintiff in a § 1983 action may proceed with both an official and individual capacity suit when it is unclear what his intentions are from his complaint. See, e.g., Melo v. Hafer, 912 F.2d 628, 635 (3d Cir.1990), aff'd on other grounds, 502 U.S. 21, 24 n. *(1991) (declining to resolve circuit split on proper approach to capacity analysis); Powell v. Alexander, 391 F.3d 1, 22 n.25 (1st Cir. 2004) ("We now join the multitude of circuits employing the 'course of proceedings' test...."); Biggs v. Meadows, 66 F.3d 56, 59-60 (4th Cir. 1995) (adopting view of the Second, Third, Fifth,

he takes under color of state law" in an individual capacity suit. Kentucky v. Graham, 473 U.S. 159, 165 (1985).  To sustain such a suit, a plaintiff must allege that the defendant directly or indirectly participated in the events giving rise to the claim. Rode v. Dellarciprete, 845 F.2d 1195, 1207-08 (3d Cir. 1988).  Since individual liability in a § 1983 action cannot be imposed under a theory of respondeat superior, [4] id., a government official cannot be liable for the actions of a subordinate without some personal involvement on the part of the official. Goode v. Rizzo, 506 F.2d 542, 550 (3d Cir. 1974) rev'd on other grounds, 423 U.S. 362 (1976)).  Personal involvement can be demonstrated through allegations of actual knowledge, participation or acquiescence, but such allegations "must be made with appropriate particularity." Rode, 845 F.2d

---

Seventh, Ninth, Tenth and Eleventh Circuits that a plaintiff need not expressly plead the capacity in which he is suing a defendant in a § 1983 action).

   Under the "course of proceedings" test, courts are not limited by the presence or absence of language identifying capacity to suit on the face of the complaint alone. Rather, courts may examine "the substance of the pleadings and the course of proceedings in order to determine whether the suit is for individual or official liability." Pride v. Does, 997 F.2d 712, 715 (10th Cir. 1993).  Factors relevant to this analysis include "the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity." Moore v. City of Harriman, 272 F.3d 769, 772 n.1 (6th Cir. 2001).  The "underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly." Biggs, 66 F.3d at 61.

   In this case, while Plaintiff's Complaint does not include Defendant's name, it appears Plaintiff intended to name Defendant personally, as well as in his official capacity.  For example, Plaintiff seeks punitive damages from Defendant which are unavailable against an official in an official capacity suit. See Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).  Further, I note that in Plaintiff's opposition brief, he argues that summary judgment is inappropriate because of Defendant's personal indifference to his medical needs. Pf. Opp. Br. at pg. 10. Accordingly, employing the course of proceedings test, and in light of my obligation to liberally construe the pleadings of a pro se plaintiff, Haines v. Kerner, 404 U.S. 519, 520 (1972), I will consider Plaintiff's Complaint to assert a claim against Defendant in his individual capacity as well as in his official capacity.

[4]   "Respondeat superior and vicarious liability are the theories under which courts 'impose liability vicariously . . . solely on the basis of the evidence of an employer-employee relationship with a tortfeasor.'" Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Monell v. Dep't of Soc. Serv. of City of New York, 436 U.S. 658, 691 (1978)).

13

at 1207-08; Brookins v. Williams, 402 F. Supp. 2d 508, 511 (D. Del. 2005). Finally, unlike in an official capacity suit, in a suit against a defendant in his individual capacity, a plaintiff may also seek punitive damages. See Smith v. Wade, 461 U.S. 30 (1983); West v. Keve, 571 F.2d 158, 163 (3d Cir. 1978).

      Here, Plaintiff does not dispute that he was under the regular medical care of CMS doctors and nurses at NJSP and that Defendant had no personal involvement with the provision of such care. Indeed, Plaintiff's Complaint and other pleadings are devoid of any specific allegations describing any direct or personal involvement by Plaintiff in the administration of Plaintiff's care. Instead, Plaintiff alleges Defendant failed to properly train the medical staff at NJSP and failed to properly supervise the manner and quality of the care provided to Plaintiff. For Plaintiff to succeed in a § 1983 action against Defendant alleging such supervisory acquiescence to a violation of Plaintiff's Eighth Amendment right to adequate medical care, he must present evidence of Defendant's "deliberate indifference" to Plaintiff's "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Groman v. Township of Manalapan, 47 F.3d 628, 636-37 (3d Cir. 1995). Specifically, Plaintiff must identify a particular policy or practice that Defendant failed to enforce and show that: (1) the existing policy or practice created an unreasonable risk of injury; (2) Defendant was aware that the unreasonable risk existed; (3) Defendant was indifferent to that risk; and (4) Plaintiff's injury result from the policy. See, e.g., Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir. 1989).

      I find that Plaintiff presents insufficient evidence to create a material factual dispute over Defendant's assertion that no policy, practice, or custom, about which Defendant was aware, existed at NJSP which created an unreasonable risk of injury to Plaintiff. Further, Plaintiff also

fails to demonstrate that Defendant was indifferent to such a risk. The only evidence Plaintiff presents in support of his argument is a bare, unsupported claim that Defendant observed a policy or custom of indifference to the medical needs of prisoners and the method and manner of CMS's treatment of prisoner ailments.[5] However, Plaintiff does not present any particular evidence in support of that conclusory allegation.

While the record reflects that on May 19, 2003, and November 4, 2004, Anna Pagan, Plaintiff's mother, addressed separate letters to Defendant in which she expressed her concern over the state of Plaintiff's health and the adequacy of his medical treatment at NJSP, such letters do not support Plaintiff's arguments that Defendant implemented, observed, or acquiesced in a policy of deliberate indifference to NJSP inmates' medical needs. To the contrary, Defendant asserts that he forwarded Pagan's letters to the NJSP Health Services Unit for resolution. That claim is supported by the May 19, 2003 reply letter to Pagan from James Barbaro, the Director of Operations at NJSP, a letter Barbaro sent to Plaintiff at NJSP because Pagan did not include a return address in her correspondence.[6] Thus, if anything, Defendant's reaction to Pagan's letters show that Defendant took allegations of inadequate care seriously, and promptly referred such matters to the relevant subordinate. Similarly, the record also reflects that the several

---

[5] It is beyond dispute that "[a] mere disagreement with the form of treatment does not rise to a constitutional violation. See Estelle, 429 U.S. at 107. Moreover, medical malpractice, even if it did occur, does not become a constitutional claim merely because the victim is a prisoner. Id. 429 U.S. at 106.

[6] Additionally, the March 27, 2003, and August 6, 2003, letters from Smith, Plaintiff's former attorney, addressed to the Superintendent of NJSP, and the Interim Medical Director at NJSP, cannot be considered as evidence of a policy of indifference observed by Defendant. Indeed, the letters were not addressed to Defendant and there is no evidence that they ever came to his attention. Furthermore, the record demonstrates that on April 8, 2003, the Assistant Superintendent of NJSP answered at least one of Smith's letters, assuring Smith that the concerns he expressed on Plaintiff's behalf would be investigated and addressed.

Administrative Remedy Forms Plaintiff filed with NJSP administrators, in which he complained about the medical care CMS was providing him, were addressed promptly by NJSP staff.

In the absence of any genuine evidence to the contrary, I find no factual dispute that Defendant did not directly or indirectly participate in the events surrounding Plaintiff's claim. Likewise, I find that no material dispute exists over Defendant's assertion that he neither instituted nor observed a policy of indifference to the medical needs of NJSP inmates, which resulted in harm to Plaintiff.  Accordingly, Defendant's motion for summary judgment against Plaintiff claim against him in his individual capacity is granted.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss Plaintiff's § 1983 claim against him in his official, and individual capacity is granted.

An appropriate Order shall follow.

/s/  Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: August 29, 2006.